# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-41057

United States Court of Appeals
Fifth Circuit

**FILED**

March 23, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ELIGIO SAN MIGUEL MENDEZ,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before KING, DENNIS, and COSTA, Circuit Judges.[*]

KING, Circuit Judge:

Eligio San Miguel Mendez was one of the targets of a gang and narcotics investigation. Officers secured a search warrant for his residence but were unable to arrange for a SWAT team to assist them. As a result, they decided to wait for him to leave the residence before moving in for the search. Once he left, the officer leading the search directed nearby officers to stop his vehicle and detain him while the search was underway. The Government does not contest on appeal that the stop was in violation of *Bailey v. United States*, 568 U.S. 186 (2013). After the officers detained Mendez, they found a revolver in his car. The search team later discovered ammunition and an empty Glock

---

[*] Judge Dennis concurs in the judgment.

No. 16-41057

pistol case in the residence. Mendez was then arrested for being a felon in possession of a firearm and interrogated at a police station. He told officers where they could find the pistol, and he confessed to ownership of the firearms and ammunition. Before trial, Mendez moved to suppress all of the Government's evidence, except for the ammunition found during the execution of the search warrant. The district court suppressed the revolver, but admitted the pistol and Mendez's statements. Mendez was convicted following a jury trial of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He now appeals the admission of the statements, arguing that they were tainted by the unlawful stop and search of his vehicle. We conclude that the connection between the unlawful stop and search and Mendez's subsequent statements was sufficiently attenuated and AFFIRM Mendez's conviction and sentence.

## I.

In January 2015, Special Agent Richard Russell of the Texas Department of Public Safety ("DPS") started investigating the Tango Corpitos gang in Corpus Christi. The investigation quickly led Russell to Eligio San Miguel Mendez. Russell discovered that Mendez had, in his words, "quite an extensive criminal history." During the investigation, Russell, working undercover, and a confidential source allegedly bought narcotics from Mendez on several occasions. Russell testified at the suppression hearing that Mendez sold narcotics from a property that was partially a mechanic shop and partially a residence. Mendez lived there with his father, girlfriend, and child.

Russell secured a search warrant for Mendez's residence on February 18, 2015, which he planned to execute two days later. Russell had obtained a no-knock warrant based on information that Mendez was dangerous and "very unstable." Mendez was a suspect in a drive-by shooting, and Russell saw bullet

## No. 16-41057

holes in vehicles around his residence. Russell was also aware of Mendez's extensive criminal history and believed that Mendez had firearms at the residence. At the suppression hearing, Russell testified that he tried to find a SWAT team to assist in the search. His efforts were ultimately unsuccessful. The DPS SWAT team was unavailable. Although the Corpus Christi Police Department's SWAT team initially agreed to help, two of its members were shot the day before the search while executing a narcotics search warrant at another residence nearby.

Unable to secure a SWAT team, Russell instead decided to surveil Mendez's residence and execute the warrant only once he had left. And so Russell parked his unmarked car across the street from Mendez's residence at 8:30 in the morning on February 20. An entry team and two marked Corpus Christi police cars were stationed a short distance away, out of sight of the residence. Russell waited an hour and a half for Mendez to leave. During that time, he saw Mendez engage in what he believed, based on his training and experience, to be hand-to-hand drug transactions.

Mendez finally left the residence with his girlfriend around 10:00 a.m. As soon as Mendez left the residence, Russell told the entry team to move in and start the search. Russell then contacted the marked units and told them to stop Mendez. Russell immediately began to follow Mendez, who, according to Russell, "was moving pretty quick." Once the marked units caught up, Russell pulled over to the side and let them pass him. The marked units ultimately stopped Mendez less than one minute after he left his residence, roughly a half-mile away. Russell returned to the residence after he saw the marked units stop Mendez.

Officer Adam Thurman—one of the officers who stopped Mendez— testified at the suppression hearing. He explained that he stopped Mendez

3

solely because Russell asked him to. He had not seen Mendez commit any traffic violations and had no reason to believe that he was carrying contraband. Nor was there any indication that Mendez was returning to the residence. Thurman knew, however, that DPS believed that Mendez was armed and dangerous, and he attended Russell's pre-search briefing. After he stopped Mendez, Thurman frisked him and detained him in the back of Thurman's vehicle. The officers detained Mendez's girlfriend in a separate vehicle. Thurman then did a "security sweep" of Mendez's vehicle. He opened a purse that he found on the floorboard in front of the passenger seat. Inside, he found an object wrapped tightly in a blue bandana. The object felt like a pistol or revolver, but Thurman did not unwrap the bandana or inspect the object. That object turned out to be a revolver, fully loaded with five rounds. During this time, Thurman asked Mendez for identifying information but did not question him about anything else.

Thurman drove Mendez back to the residence once it had been secured. During the search, officers discovered loose ammunition and an empty Glock pistol case.[1] After officers completed the search, they transported Mendez to the DPS office, where they placed him under arrest and interrogated him.

Juan Hernandez, an agent of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), interrogated Mendez along with DPS agent David Poland and testified at the suppression hearing. The agents advised Mendez of his *Miranda* rights, which he agreed to waive. Hernandez testified that Mendez told officers that the revolver found in the vehicle belonged to him. Hernandez told Mendez that he had not been able to search the residence

---

[1] A confidential source had informed DPS that Mendez owned a Glock pistol. When Russell heard that Thurman found a gun in Mendez's vehicle, he initially assumed that it was the Glock. Only when he saw the revolver at the DPS office did he realize that the search team had not recovered Mendez's Glock pistol.

thoroughly and asked Mendez to tell him what the search team had found. According to Hernandez, Mendez told him that the search team should have found some ammunition and a Glock pistol. Based on Mendez's statements, Russell and Hernandez returned to the residence to search for the pistol. Mendez's father, who lived at the residence, consented in writing to the search. Russell and Hernandez quickly found the pistol, as well as additional rounds of ammunition, in the place Mendez told them it would be.

A grand jury returned a one-count indictment charging Mendez with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On June 10, 2015, the district court entered a scheduling order requiring all discovery to be completed within 20 days. Mendez filed his motion to suppress on September 1, 2015. He requested that the district court suppress any and all evidence and statements acquired during and as a result of the stop, including Mendez's statements to Hernandez and Poland. He argued that the revolver, statements, and evidence found during the second search were all "fruit" of the unlawful stop and should be suppressed unless the Government could demonstrate attenuation. The district court held a suppression hearing during which the Government called three witnesses: Thurman, Russell, and Hernandez. Mendez called no witnesses. His counsel cross examined Thurman and Russell, but declined to cross examine Hernandez. The court took the matter under advisement and invited Mendez to submit supplemental briefing, which he did.

The court subsequently granted the motion in part and denied it in part. Specifically, the court held that the stop of Mendez nearly a half-mile from his home was unlawful under *Bailey v. United States*, 568 U.S. 186, 199–200

(2013).[2] Accordingly, it suppressed the revolver and the ammunition found therein. The district court reached a different conclusion regarding Mendez's statements and the evidence from the second search. It held that the Government had demonstrated attenuation because Mendez's lawful arrest for being a felon in possession of ammunition was a "break in the chain of events from his detention incident to the search warrant." Thus, the district court did not exclude Mendez's statements or the evidence found during the second search.

Mendez was convicted following a jury trial during which excerpts from his custodial interview were played. The district court sentenced him to 84 months of incarceration and three years of supervised release. Mendez now appeals the ruling on the motion to suppress. He argues that the district court erred by basing its finding of attenuation solely on his intervening arrest. Although we conclude that the district court likely erred by considering only Mendez's intervening arrest, we nonetheless conclude that the Government sufficiently demonstrated attenuation.

## II.

The parties disagree about the standard of review. On review of a motion to suppress, we typically review the district court's factual findings for clear error and its legal conclusions de novo. *See, e.g.*, *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012). A factual finding "is clearly erroneous if we are 'left with a definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010)). Where, as here, the district court heard live testimony, our review is particularly deferential. *See, e.g.*, *United States v. Tovar*, 719 F.3d 376, 384

---

[2] The Government is not appealing the suppression of the revolver, nor does it challenge the district court's conclusion that the stop was unlawful.

(5th Cir. 2013). "In addition to deferring to [] the district court's factual findings, the court must view the evidence 'most favorably to the party prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole.'" *Scroggins*, 599 F.3d at 440 (quoting *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993)). Thus, the district court's ruling "should be upheld 'if there is any reasonable view of the evidence to support it.'" *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999) (quoting *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993)).

The Government concedes that this standard should apply to Mendez's argument that the district court erred by concluding that the intervening lawful arrest, standing alone, established attenuation. However, the Government argues that plain error review should apply to Mendez's argument that the district court was required to examine other factors relevant to the attenuation analysis. According to the Government, Mendez should have objected below and given the district court the opportunity to correct these alleged errors.

The Government is only half right. An error not brought to the district court's attention is, as the Government notes, subject to plain error review. *See* Fed. R. Crim. P. 52(b). But taking an exception to an adverse ruling is unnecessary. *See* Fed. R. Crim. P. 51(a); *United States v. Delgado*, 672 F.3d 320, 348 (5th Cir. 2012). Here, the Government bore the burden of demonstrating attenuation, as Mendez argued in his briefing in the district court. As far as the stop is concerned, Mendez "plainly asserted his view that" his confession was the fruit of an unlawful stop and that the Government could not prove any of the factors demonstrating attenuation, even if he "did not make the best case to the district judge" for why attenuation was lacking.

No. 16-41057

*United States v. Martinez*, 486 F.3d 855, 860–61 (5th Cir. 2007). Mendez put the Government and district court on notice of the relevant legal standard, allowing "the trial court to take testimony, receive argument, or otherwise explore the issue raised." *Id.* at 860 (quoting *United States v. Burton*, 126 F.3d 666, 673 (5th Cir. 1997)). Accordingly, insofar as Mendez argues that his statements were "fruit" of the unlawful stop, we apply the usual standard of review, rather than plain error. *See id.* at 860–61.

But Mendez also argues on appeal that the unlawful search of his vehicle tainted his subsequent statements. This presents a related but different issue. As we explain later, the attenuation analysis differs slightly when the official misconduct is a search rather than a seizure. Mendez's failure to identify the search as a source of his statements, independent of his arrest, deprived the Government of the opportunity to meet its burden to show attenuation in the district court. Although the Government called Hernandez to testify, Mendez did not cross examine him or present any other evidence that Hernandez used the revolver to pressure Mendez into confessing to ownership of the ammunition and pistol. As a result, we review this separate claim only for plain error. Mendez must demonstrate a plain error that affected his substantial rights. *See United States v. Olano*, 507 U.S. 725, 732 (1993). In order to be "plain," the error must be obvious and beyond reasonable dispute. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). Even if he does demonstrate plain error, we retain discretion over whether to correct the error. *See Olano*, 507 U.S. at 732. The Supreme Court has admonished us to exercise that discretion only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). This is a "stringent and difficult" standard. *United States v. Escalante-Reyes*, 689 F.3d 415, 422 (5th Cir. 2012) (en banc).

8

No. 16-41057

## III.

The Fourth Amendment commands that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The exclusionary rule provides the typical remedy for Fourth Amendment violations: suppression of the evidence at trial. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016); *Mapp v. Ohio*, 367 U.S. 643, 648 (1961). The exclusionary rule reaches not only the evidence uncovered as a direct result of the violation, but also evidence indirectly derived from it—so-called "fruit of the poisonous tree." *Strieff*, 136 S. Ct. at 2061 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)); *see Nardone v. United States*, 308 U.S. 338, 341 (1939). In this context, the exclusionary rule is subject to three safety-valve doctrines: independent source, inevitable discovery, and attenuation. *See Strieff*, 136 S. Ct. at 2061 (first citing *Murray v. United States*, 487 U.S. 533, 537 (1988); then citing *Nix v. Williams*, 467 U.S. 431, 443–44 (1984); and then citing *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)). The last is at issue here.

The attenuation doctrine "evaluates the causal link between the government's unlawful act and the discovery of evidence." *Id.* Evidence may be sufficiently attenuated from the Fourth Amendment violation even where the violation is a but-for cause of the discovery of the evidence. *See Hudson*, 547 U.S. at 592; *Wong Sun v. United States*, 371 U.S. 471, 487 (1963). The key question is whether the evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Brown v. Illinois*, 422 U.S. 590, 599 (1975). The relevant factors to determine attenuation will depend on the type of evidence challenged and official misconduct alleged. In *Brown*, the Court laid out the factors to be considered when, as here, challenged custodial statements are the "fruit" of an

unlawful arrest: (1) the provision of *Miranda* warnings; (2) the temporal proximity between the unlawful arrest and the challenged statements; (3) intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *See Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curiam) (quoting *Brown*, 422 U.S. at 603–04); *Hernandez*, 670 F.3d at 621. Of these factors, the Supreme Court has emphasized that the fourth—purpose and flagrancy—is particularly important. *See Strieff*, 136 S. Ct. at 2062. If the unlawful conduct at issue is a search, the court should also consider whether the officers exploited any illegally obtained evidence to secure the defendant's statement. *See United States v. Shetler*, 665 F.3d 1150, 1158 (9th Cir. 2011); 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(c) (5th ed. 2012). The court cannot apply the attenuation analysis, however, unless it first determines that the challenged statements were voluntary. *See, e.g.*, *United States v. Martin*, 431 F.3d 846, 849 (5th Cir. 2005) (quoting *Brown*, 422 U.S. at 604).

## A.

The district court correctly recited the relevant attenuation factors in its order but provided no analysis of temporal proximity or flagrancy. Rather, it determined that Mendez's lawful arrest for being a felon in possession of ammunition "was sufficient to constitute a break in the chain of events." As we have already made clear, however, the intervening development of probable cause to justify a previously unlawful arrest is an "important attenuating factor" but is not by itself sufficient to establish attenuation. *See United States v. Cherry (Cherry II)*, 759 F.2d 1196, 1211–12 (5th Cir. 1985). A district court must consider each factor and determine the cumulative effect of all factors in each case. *See United States v. Cherry (Cherry III)*, 794 F.2d 201, 206 (5th Cir. 1986) ("The totality of their effect must be evaluated in relation to the

No. 16-41057

particular facts of each case."); *see also Brown*, 422 U.S. at 603 ("No single fact is dispositive."). Thus, it was error for the district court to base its attenuation analysis on a single factor.

The parties disagree about the import of this error on appeal. Mendez asks that we vacate his conviction and remand to the district court to make the appropriate findings. The Government, by contrast, urges us to review the record independently and make the attenuation determination ourselves. The Government has the stronger argument in this particular case. Even where the district court has not made any factual findings, we have "independently review[ed] the record to determine whether the district court's decision is supported by 'any reasonable review of the evidence.'" *United States v. Santiago*, 410 F.3d 193, 198 (5th Cir. 2005) (quoting *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir. 1991)); *see United States v. Jarman*, 847 F.3d 259, 266 (5th Cir. 2017). But in cases where the district court failed to "ask[] the right legal questions" and expressly declined to make factual findings necessary to resolve those questions, we have declined to resolve those factual disputes in the first instance. *See United States v. Guzman*, 739 F.3d 241, 247–49 (5th Cir. 2014). Here, the district court made detailed factual findings following a suppression hearing during which it heard live testimony from three witnesses. The district court invoked the correct legal standard, even though the court applied that standard incorrectly. Moreover, the resolution of this case turns on the significance of largely undisputed facts.[3] This is prime appellate territory. No remand is necessary here.

---

[3] Mendez does argue on appeal that a remand is warranted to further explore whether the police used the revolver found during the illegal search to secure Mendez's confession. As we explain later, however, this single factual dispute does not warrant remand to the district court, nor does it change the result on appeal.

**B.**

At the outset, we must determine whether Mendez's statements were voluntary before proceeding, if they were, to the attenuation analysis. *See Brown*, 422 U.S. at 603; *Martin*, 431 F.3d at 849. When a defendant challenges the voluntariness of a statement, the Government bears the burden of proving voluntariness by a preponderance of the evidence. *United States v. Reynolds*, 367 F.3d 294, 297–98 (5th Cir. 2004) (per curiam). A statement is voluntary if, "under the totality of the circumstances, the statement is 'the product of the accused's free and rational choice.'" *Id.* at 298 (quoting *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998)). A statement cannot be involuntary in the absence of coercive police activity. *See Garcia Abrego*, 141 F.3d at 170 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

Under the circumstances, Mendez's statements were voluntary. Poland advised Mendez of his *Miranda* rights, which Mendez (twice) confirmed he understood and voluntarily waived. *Cf. Cherry III*, 794 F.2d at 206 (concluding that defendant's statement was voluntary where he was twice advised of and voluntarily waived his *Miranda* rights). There is also no evidence of physical coercion: Hernandez testified that during the 90-minute interview, Mendez was handcuffed from the front rather than from behind, was allowed to take breaks, and was offered water. The officers also did not threaten Mendez.

Mendez argues in his brief that a transcript of excerpts from his interrogation shows that Hernandez threatened to charge Mendez's girlfriend with possession of the revolver discovered during the illegal search. Mendez does not actually argue, however, that this alleged threat rendered his statement involuntary, merely that it demonstrates that the officers exploited the illegal search to obtain a confession. Moreover, by that point in the interview, Mendez had already told Hernandez that he had ammunition in the

residence, that he owned the pistol, described where the pistol was, and admitted that he bought the pistol for "two bills" (i.e., $200). Those statements all concerned evidence found legally at the residence, not evidence obtained from the illegal stop and search. They demonstrate that Mendez was already talking freely and voluntarily by the time Hernandez brought up Mendez's girlfriend. Accordingly, it is clear that Mendez "spoke as a result of his free and rational choice, with an awareness of his abandonment of the right to remain silent and of the consequences of that decision." *United States v. Rico*, 51 F.3d 495, 507 (5th Cir. 1995).

## C.

Having determined that Mendez spoke voluntarily, we move on to the attenuation analysis. Although, as noted previously, the stop and search are analytically distinct in some respects, they were roughly contemporaneous and led to a single challenged confession. Thus, our analyses of the first three *Brown* factors for the stop and search largely overlap. To the extent that these analyses overlap, we apply the more generous standard of review applicable to our analysis of the stop. Once the analyses begin to part ways, however, a plain error standard will apply to our attenuation analysis of the search.

As noted previously, the officers read the *Miranda* warnings to Mendez, confirmed that he understood them, and secured a knowing waiver of his rights. This weighs in favor of attenuation.

However, the temporal proximity factor favors Mendez. There are no precise time limits for temporal proximity. *See United States v. Montgomery*, 777 F.3d 269, 273–74 (5th Cir. 2015). But where relatively little time has elapsed, the determination generally turns on the conditions of custody. *See* 6 LaFave, *supra*, § 11.4(b) ("[A] shorter lapse of time will be tolerated when the circumstances of the detention are less severe."); *compare Taylor v. Alabama*,

457 U.S. 687, 691 (1982) (holding that six-hour interval did not favor Government where defendant was "in police custody, unrepresented by counsel, and he was questioned on several occasions"), *with Rawlings v. Kentucky*, 448 U.S. 98, 107–08 (1980) (holding that 45-minute interval favored Government where defendant was allowed to move around house freely and atmosphere was congenial). The parties agree that only a few hours elapsed between the stop and Mendez's statements. Indeed, the Government estimates that less than two hours may have elapsed between the stop and the custodial statements. *Cf. Brown*, 422 U.S. at 604 ("Brown's first statement was separated from his illegal arrest by less than two hours . . . ."). Moreover, Mendez was continuously in custody—at first in the back of Thurman's vehicle and then at the DPS office. Consequently, the temporal proximity factor weighs against attenuation. Even so, "temporal proximity is not dispositive," *Montgomery*, 777 F.3d at 274, and is typically the "least determinative factor involved," LaFave, *supra*, § 11.4(b).

The intervening circumstances, by contrast, favor the Government. In *Cherry III*, evidence independent from the illegal arrest established probable cause to arrest the defendant. *See* 794 F.2d at 206. The court concluded that the intervening circumstances favored the Government because "[t]he development of independently procured probable cause following an illegal arrest is a critical factor attenuating the taint of the initial illegal arrest." *Id.*; *cf. Strieff*, 136 S. Ct. at 2062–63 (holding that intervening discovery of valid arrest warrant following unlawful stop "strongly favor[ed] the State"). Shortly after the illegal arrest, the Government discovered ammunition in Mendez's residence pursuant to the search warrant. Mendez does not dispute that the search warrant was valid—indeed, he conceded during the suppression hearing that it was. Nor does he dispute that officers had probable cause to

14

arrest him after discovering the ammunition. As such, the intervening circumstance of Mendez's lawful arrest strongly favors the Government.

Finally, the purpose and flagrancy factor favors the Government with respect to both the stop and subsequent search. Suppression of inculpatory evidence is an extraordinary remedy. *See Hudson*, 547 U.S. at 591. This factor ensures that it is applied only where it serves its purpose of deterring police misconduct. *Strieff*, 136 S. Ct. at 2063. In order for a violation to be "purposeful or flagrant," it must be more than just negligent. *See id.*

We begin with the stop and find that the officers' actions do not rise above the level of negligence. They had initially planned to enter the residence with a SWAT team while Mendez was still there. When that plan fell through, they instead decided that it would be safest to wait for him to leave. They knew that Mendez was armed, dangerous, and unstable. They knew that he was a suspect in a drive-by shooting. They knew that there were bullet-riddled vehicles sitting in his front yard. While waiting to call in the entry team, Russell witnessed Mendez engage in what appeared to be hand-to-hand drug transactions and testified that he believed there was probable cause to stop Mendez even before the search. Although Thurman stopped Mendez only because Russell told him to, he still knew that DPS believed that Mendez was armed and dangerous. Moreover, it is clear that officers attempted to stop Mendez as soon as they could, but the need to conceal their presence from Mendez limited how quickly they could apprehend him once he left the residence. There is no evidence that this was part of a pattern of "systemic or recurrent police misconduct," *id.*, or that the officers were engaged in a fishing expedition just to see what "might turn up," *Brown*, 422 U.S. at 605; *cf. Kaupp*, 538 U.S. at 628, 633 (holding that misconduct was purposeful and flagrant where police tried and failed to obtain warrant but detained suspect

nonetheless). Indeed, because the officers could have detained Mendez and tried to talk to him at the residence by executing the warrant earlier that morning, they had no reason to believe that there was an investigative advantage to be gained by waiting to do so until he was half a mile away. Rather, the officers (as they testified) were motivated by genuine, serious, and objectively reasonable safety concerns.

Mendez argues that the misconduct here was purposeful and flagrant. He notes that the Supreme Court had decided *Bailey* two years before he was stopped. He contends that, in light of *Bailey*, this was at the very least reckless or grossly negligent. But this is just another way of saying that the officers violated *Bailey*. It "conflates the standard for an illegal stop with the standard for flagrancy." *Strieff*, 136 S. Ct. at 2064. Misconduct is not "flagrant" just because officers violated the Fourth Amendment. Rather, "[f]or the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Id.* What Mendez identifies is simply the primary misconduct, not some aggravating factor that makes that misconduct "flagrant." He also argues that the misconduct was purposeful because the officers planned in advance to stop Mendez after he left the residence. What *Brown* requires, however, is improper purpose or conscious wrongdoing, not merely advance planning.[4] *See Brown*, 422 U.S. at 605; *Rawlings*, 448 U.S. at 110.

We reach the same conclusion with respect to the subsequent search, though our review of this claim is for plain error only. Thurman testified that he did "a quick security sweep of the vehicle." He also testified that he merely

---

[4] Accepting Mendez's definition of "purpose" would render almost all police conduct purposeful. Only truly spur-of-the-moment conduct would seem to escape Mendez's definition.

reached inside the purse and felt the bandana and revolver, but did not unwrap the bandana or remove the revolver from the purse. Mendez did not challenge that testimony or seek to undermine it on cross examination. Thurman's conduct was not purposeful or flagrant under the circumstances. At the time of the search, Thurman (mistakenly) believed that he had lawfully detained Mendez. He had reason to believe that Mendez was armed, and, upon finding no weapon on Mendez, he could have reasonably believed that there was a weapon in the car. The search was not merely some fishing expedition intended to unearth evidence to use against Mendez later. Rather, it was carefully limited to address Thurman's safety concerns, as indicated by his testimony that he did not remove the revolver from the purse. Even though that conduct was unlawful, it was not "flagrant."

Nor does Mendez's speculation regarding the interrogation change the result. Of course, the use of illegally obtained evidence to pressure a suspect to confess will normally weigh heavily against a finding of attenuation. *See Shetler*, 665 F.3d at 1158; *see also* 6 LaFave, *supra*, § 11.4(c) ("This is because 'the realization that the "cat is out of the bag" plays a significant role in encouraging the suspect to speak.'" (quoting Robert M. Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized*, 56 Cal. L. Rev. 579, 607 (1968))). But our review here is for plain error only, and we find none. Mendez claims that the following exchange (drawn from a transcript of redacted excerpts of the interview) demonstrates that Hernandez used the unlawfully obtained revolver to pressure Mendez to confess to ownership of the pistol:

> **Q.** I—we want to make sure we don't charge anybody else with that gun. If that gun's not your girl's and it's yours, it's yours. You're manning up to it.
> **A.** It's mine, bro.
> **Q.** And the Glock pistol that was in your bedroom, in the back bedroom, that's yours, too?

17

No. 16-41057

**A.** Yes.

According to Mendez, this excerpt warrants remand for examination of the full 90-minute audio recording. Viewed in context, it is far from clear or obvious that Mendez admitted to ownership of the Glock solely because the Government confronted him with the revolver. By that point in the interview, Mendez had already told Hernandez that there was ammunition in the residence, that the ammunition was his, that there was a Glock pistol in the back room of the residence, and that he bought the Glock pistol for $200. Mendez's admission that he bought the pistol was sufficient to establish possession or receipt of the firearm under 18 U.S.C. § 922(g). The Government is not required to prove ownership to sustain a conviction. *See, e.g.*, *United States v. Jones*, 133 F.3d 358, 362 (5th Cir. 1998) (per curiam). Moreover, Mendez at that point believed that the search team had found both the ammunition and the pistol. Thus, he was already under the impression that there was a significant amount of legally obtained evidence against him.[5]

Mendez speculates that elsewhere in the interview, Hernandez may have exploited the revolver to pressure Mendez into confessing. He faults the Government for not introducing the entire interview at the suppression hearing. But the Government put Hernandez on the stand to testify about the

---

[5] *Cf. United States v. Green*, 523 F.2d 968, 972 (9th Cir. 1975) ("We reject [defendant's] naive contention that his confession of illegal drug trafficking would probably have been valid if he had been confronted with only [] 880 pounds of marijuana . . . , but when the illegally seized amphetamines and 400 pounds of marijuana were added to the pot, his confession became the 'fruit of the poisoned tree' and 'the product' of the illegally seized contraband."); *cf. also United States v. Riesselman*, 646 F.3d 1072, 1079–80 (8th Cir. 2011) (holding that defendant's statements were sufficiently attenuated where Government did not question defendant solely about unlawfully obtained evidence but also confronted him with a confidential informant's statements and weapons found at his residence); *United States v. Patino*, 862 F.2d 128, 133–34 (7th Cir. 1988) (holding that defendant's second confession was not the product of her unlawfully obtained first confession where "she previously had been told that her involvement in the robberies could be proved without the confession").

interview. Hernandez testified that he asked Mendez to tell him what the search team had found, rather than confronting him with the evidence they did find. According to Hernandez, Mendez "was taking ownership pretty much of everything." The Government was not required to put in every possible piece of evidence to rebut any assertion of exploitation that Mendez might conceivably make in the future. Mendez had the opportunity to cross examine Hernandez but declined to do so. He can hardly say he was unaware of what happened during the interview—he was a party to it. And Mendez's speculation that there might perhaps be further evidence of exploitation somewhere in the remainder of the transcript is hardly sufficient to meet his burden of demonstrating a "clear" or "obvious" error. *See Olano*, 507 U.S. at 734.

In sum, only the temporal proximity factor favors Mendez. With respect to both the stop and the subsequent search, the remaining *Brown* factors weigh heavily in favor of attenuation. Mendez was informed of, understood, and waived his *Miranda* rights. Mendez's lawful arrest for being a felon in possession of ammunition was a critical intervening circumstance. And, perhaps most importantly, the misconduct at issue was not purposeful and flagrant, but instead motivated by legitimate safety concerns. Finally, Mendez's speculation as to how the officers may have exploited the unlawfully obtained revolver to secure his statements is simply too little, too late. The district court properly admitted the statements.

## IV.

For the foregoing reasons, we AFFIRM Mendez's judgment of conviction and sentence.