18-3729-cr
*United States v. Walker*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2019

(Argued: January 9, 2020                         Decided: July 14, 2020)

Docket No. 18-3729

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

JAQUAN WALKER,

*Defendant-Appellant.*

_____

Before: CALABRESI, POOLER, and CARNEY, *Circuit Judges.*

Appeal from an order of the United States District Court for the Northern District of New York (Thomas J. McAvoy, *J.*) denying Walker's motion to suppress statements made and narcotics discovered during a search incident to arrest. We hold that the officers lacked an objectively reasonable belief of legal

wrongdoing to justify stopping Walker. We further hold that the attenuation

doctrine does not apply. Suppression of the narcotics and Walker's statements

during the search was accordingly warranted as the fruit of an illegal search

conducted in violation of the Fourth Amendment.

Reversed and remanded.

_____

MOLLY K. CORBETT, Assistant Federal Defender, *for*
Lisa A. Peebles, Federal Public Defender for the
Northern District of New York, Albany, NY, *for*
*Defendant-Appellant*.

PAUL D. SILVER, Assistant United States Attorney, *for*
Grant C. Jaquith, United States Attorney for the
Northern District of New York, Albany, NY, *for Appellee*.

POOLER, *Circuit Judge*:

Jaquan Walker appeals from the December 13, 2018 judgment of

conviction entered in the United States District Court for the Northern District of

New York (Thomas J. McAvoy, *J.*) and challenges the denial of his motion to

suppress statements Walker made and narcotics that police officers found in the

course of a search incident to arrest following the stop of Walker and discovery

of an unrelated arrest warrant.

2

The Fourth Amendment requires that officers enacting an investigatory stop have reasonable suspicion that the detained individual is committing, or has committed, a criminal offense—and "courts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop." *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005). Nonetheless, the officers in this case stopped Walker on the basis of a photograph that provided little meaningful identifying information to the police besides the race of a suspect. Because the police therefore lacked specific and articulable facts giving rise to a reasonable suspicion of criminal wrongdoing, we hold that the stop violated the Fourth Amendment.

The resultant taint of illegality was not purged by the officers' subsequent discovery of an unrelated arrest warrant. We conclude that the search of Walker yielding the narcotics and statements at issue was insufficiently attenuated from the unconstitutional stop. The officers' justification for the stop falls much too short of what the Fourth Amendment requires. Additionally, any suspicion, reasonable or otherwise, would have dissipated when the officers approached Walker and could see up close that he did not resemble the photographed suspect. The subsequent search for outstanding warrants was consequently

3

purposeful and flagrant conduct. We therefore hold that the attenuation doctrine does not apply, and suppression of the statements and narcotics remains the appropriate remedy.

Accordingly, we reverse the district court's denial of Walker's motion to suppress and remand for further proceedings consistent with this opinion.

**BACKGROUND**

At approximately 6:50 pm on September 2, 2017, Sergeant Peter Montanino of the City of Troy Police Department was on patrol in the Central Business District of Troy, New York. As he drove southbound down Church Street alley, two black males—Jaquan Walker and his friend Javone Hopkins—entered the alley and walked north past Montanino. The area in which Walker and Hopkins were walking was considered a safe area, and it was not uncommon for people to be walking around in this area at the time.

As Walker and Hopkins walked by, Montanino said he recalled an email he had received a day before that sought the identification of a suspect in a shooting that took place two days earlier. The email included a photograph along with the message that the sender was "trying to ID suspect #2 in this photo," mentioned the name of another suspect, and asked that anyone who knew the

4

identity of "suspect #2" or had interacted with the other suspect reach out to the lead officers on the case. App'x at 123. Montanino pulled up this email on his iPhone 6 after Walker and Hopkins walked by, looked at the photograph, and then decided that he needed to identify who the two individuals were.

Montanino testified that Walker and Hopkins reminded him of the suspect in the email because both Walker and Hopkins were "medium to dark skin toned black males. They were thin build. Both were wearing glasses at the time. One had little longer length, longer than shoulder length hair. The other one had what appeared to be short hair. . . . Both had facial hair. . . . Both appeared to have goatees." App'x at 45. Without explaining his suspicions, Montanino then called two of his subordinates, Officers Owen Conway and Martin Furciniti, and asked if they could identify the two pedestrians.

When the officers could not, Montanino asked Conway and Furciniti to "stop out" and identify them. App'x at 47-48. Stopping out is a practice of the Troy Police Department in which officers stop and exit their vehicle, approach pedestrians, request information and identification from the pedestrians, and check for outstanding warrants, which Furciniti testified was part of a standard procedure. Montanino testified that it was a "common course of practice, if

5

somebody is willing to give us, you know, their information, as a course of business, so to speak, we will run their names." App'x at 49-50. Montanino testified that the stop out practice is typically employed with individuals unknown to the officers who are set to patrol a certain zone.

The "stop out" of Walker and Hopkins occurred in the following fashion: Conway and Furciniti pulled up ahead of Walker and Hopkins, and Montanino pulled up behind them before they all converged. Walker testified that he and Hopkins were instructed to stop by the officers. Furciniti testified that the officers asked if they could have a word with the men. No police vehicle lights were flashing, but all the officers were uniformed with weapons on their sides.

The officers asked for identification, and Walker, feeling that he had no other option, gave over his identification. Montanino showed Furciniti the photograph in the email. Conway and Furciniti collected Walker and Hopkins's information and ran a file check for warrants and driver licenses. He also showed the photograph to Hopkins. It was later determined that Walker was not the person depicted in the photograph on which Montanino relied.

When the officers discovered the outstanding arrest warrant for Walker, Walker was placed in handcuffs. Hopkins was allowed to leave. Walker was

brought to the police car where Furciniti conducted a search incident to arrest. He found marijuana on Walker and continued to pat him down when he felt a bulge in Walker's groin area. Furciniti then asked Walker if "there was anything else [Furciniti] need[ed] to know," to which Walker replied that he possessed approximately fifty grams of crack cocaine. App'x at 95. Walker offered to retrieve the narcotics and also provided officers with information about drug and gun activity.

Walker was then charged with possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). He moved to suppress the drug evidence and any statements made during his arrest. The district court ultimately denied the motion. The district court found that Montanino thought Walker and Hopkins "reassembled [sic] a picture of a suspect in a shooting incident that had occurred on August 31, 2017 . . . about five blocks from where Sgt. Montanino first observed the men walking." App'x at 128. It also found that Walker, Hopkins, and "the shooting suspect were medium-to-dark skinned Black males, had similar builds, wore glasses, and had facial hair. The shooting suspect and Walker both had long hair." App'x at 128. It then held that the officers had reasonable suspicion to stop Walker because "Montanino observed

that Defendant resembled a shooting suspect depicted in a picture of the shooting scene," and this reasonable suspicion could be imputed to Furciniti and Conway under the collective knowledge doctrine. App'x at 131. It concluded that because Walker was lawfully stopped and then arrested on an outstanding warrant, the "fruit of the poisonous tree" doctrine did not apply, and suppression of the found narcotics and Walker's statements was thus not required. The district court further held that Furciniti's question to Walker was not a custodial interrogation requiring *Miranda* warnings, so suppression of Walker's response was not required.

After the court's denial of his motion, Walker entered a conditional plea. The plea agreement allowed Walker to appeal the issue of "whether police lacked reasonable suspicion to stop the defendant on September 2, 2017 such that the cocaine base and post-arrest statements obtained from him should be suppressed under the Fourth Amendment." App'x at 137. Should Walker prevail, he would be free to withdraw his plea.

Walker timely appealed.

## DISCUSSION

8

"On review of a challenged suppression order, we examine the district court's findings of fact for clear error, reviewing *de novo* questions of law and mixed questions of law and fact, including the existence of reasonable suspicion to stop or extend a stop." *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018). Our review is informed by the totality of the circumstances from the view of a reasonable and cautious officer on the scene. *Id.*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Though officers may "approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," *Terry v. Ohio*, 392 U.S. 1, 22 (1968), the stop must be justified on the basis of reasonable suspicion "that the person to be detained is committing or has committed a criminal offense," *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (internal quotation marks and citation omitted).

Walker argues that the officers lacked reasonable suspicion to stop him because: (1) the email that Montanino relied on did not contain specific or articulable facts to suggest that the depicted individual had committed any crime; and (2) even assuming the email could provide reasonable suspicion of

9

criminal activity, the photograph was not detailed enough and matched too many individuals to provide reasonable suspicion to stop Walker. The Government asserts that even if the officers lacked reasonable suspicion, the search was sufficiently attenuated from the unconstitutional stop by the discovery of an unrelated warrant so that suppression is not required under the attenuation doctrine. Walker responds that the attenuation doctrine does not apply because his stop was conducted pursuant to a policy by which police officers may stop any pedestrian and search for warrants, and the warrant check occurred after any suspicion would have been dispelled, making the stop purposeful and flagrant conduct.

## I.  The Officers Lacked Reasonable Suspicion

"Reasonable suspicion demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing. In assessing reasonable suspicion, courts look at the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily guided by his experience and training. Courts do not, however,

merely defer to police officers' judgment." *United States v. Wallace*, 937 F.3d 130, 138 (2d Cir. 2019) (internal quotation marks and citations omitted).

We have little trouble concluding that the officers in this case lacked reasonable suspicion to stop Walker.[1] The justification for the stop revolved around an emailed photograph of an individual, who Montanino claimed was a suspect in a recent shooting and looked like Walker.[2] There are multiple reasons why the Government's justification falls far short of what the Constitution requires.

---

[1] The Government conceded as much at oral argument. In response to Judge Pooler's question of whether the Government "concede[s] there was no reasonable suspicion, the photograph is not revealing enough to identify . . . either of these two black men, there was no reasonable suspicion, they shouldn't have been able to ask for the ID, and they shouldn't have been able to do a warrant search," counsel for the Government responded, "I'm with you up to the last point, your honor." Oral Argument at 24:02-24:23; *see also* Oral Argument at 23:34-42 ("conceding" the lack of reasonable suspicion to stop Walker).

[2] We find it noteworthy that Montanino, in contravention of usual practice, did not inform Conway and Furciniti that he thought Walker or Hopkins had been involved in a shooting, or were otherwise suspected to be dangerous, when he ordered the stop out. This omission is peculiar in light of the proffered justification. However, because an officer's subjective beliefs are irrelevant to our inquiry, *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000), we nonetheless accept the Government's justification for purposes of conducting our analysis.

11

First, Montanino lacked reasonable suspicion to stop Walker based on the photograph. As we have repeatedly said, "race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop." *Swindle*, 407 F.3d at 569-70. For instance, we have said that the description of a suspect as "thin, black, and male" was "too vague . . . to justify a stop of anyone meeting it." *Dancy*, 843 F.3d at 109. Here, the characteristics of the suspect identified by the district court based on the photograph—black male, medium-to-dark skin tone, glasses, facial hair, and long hair—is likewise a "description [that] fit[s] too many people to constitute sufficient articulable facts on which to justify a forcible stop." *Id.*

The use of "black male" and "medium-to-dark" skin tone alone captures a wide swath of individuals. Nor are the other traits, such as glasses, long hair, or facial hair, of which there are numerous types, any more particularized. Even with the combination of these characteristics, we are simply not convinced that the description fits a narrow enough subset of individuals to constitute a specific, articulable fact upon which reasonable suspicion may be based. *See Terry*, 392 U.S. at 15 ("Under our decision, courts still retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which

trenches upon personal security without the objective evidentiary justification which the Constitution requires.").

Second, the fact that Walker was walking near the crime scene also fails to support reasonable suspicion. As the officers themselves testified, it was not unusual to see individuals walking around in the Central Business District of Troy where Walker was stopped. Therefore, although Walker and Hopkins were "found walking within several city blocks of the crime scene, such proximity was innocuous given the unremarkable nature of the area in question." *Dancy*, 843 F.3d at 109.

Finally, though the district court concluded that Montanino believed the photographed individual was a suspect in a shooting, this finding is clearly erroneous. Although Montanino testified that the email related to a shooting suspect, the email containing the photograph itself simply states that the sender was "trying to ID suspect #2," without any mention of any crime, let alone a shooting, or the depicted suspect's criminal involvement. App'x at 123. In addition, Montanino admitted that he did not know where the photograph was taken or whether the depicted individual was even the shooter. As such, the district court's decision to credit Montanino's testimony that he believed the

13

photograph showed a shooting suspect is clear error. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error.").

This lack of evidence is critical. Absent any indication that the photographed individual had been involved in the shooting—that is, "specific and articulable facts which . . . provide . . . a particularized and objective basis for suspecting legal wrongdoing," *Dancy*, 843 F.3d at 106—Montanino lacked reasonable suspicion to justify stopping the person depicted in the photograph. As a result, Montanino's claim that Walker looked like the individual in the emailed photograph could not provide him a sufficient basis upon which to stop Walker.

Because there was no indication in the email that the individual depicted in the attached photograph had committed a crime, and because attributes derived from the photograph fit too many people to constitute sufficient articulable facts, we conclude that the Troy Police Department officers did not

14

have reasonable suspicion that Walker had engaged in criminal activity to justify stopping him.

**II.     The Attenuation Doctrine Does Not Apply**

Although the stop in this case was unconstitutional, that does not necessarily mean that the evidence against Walker must be suppressed. While it is true that typically "the exclusionary rule—the rule that often requires trial courts to exclude unlawfully seized evidence in a criminal trial—became the principal judicial remedy to deter Fourth Amendment violations," that rule has exceptions. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id.* (internal quotation marks and citation omitted).

Whether the doctrine applies turns on three factors. "First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the

unconstitutional search." *Id*. at 2062 (internal quotation marks and citation omitted). A space of "only minutes after the illegal stop" counsels against attenuation. *Id.* "Second, we consider the presence of intervening circumstances." *Id.* (internal quotation marks and citation omitted). A valid warrant that predates the unconstitutional conduct and "is entirely unconnected with the stop" supports attenuation. *Id.* "Third, and particularly significant, we examine the purpose and flagrancy of the official misconduct." *Id.* (internal quotation marks and citation omitted). Conduct that is "at most negligent" weighs in favor of attenuation, as does the absence of any indication "that this unlawful stop was part of any systemic or recurrent police misconduct," a "suspicionless fishing expedition," or "a dragnet search" for outstanding arrest warrants. *Id.* at 2063-64.

In the case before us, there is no question that the temporal-proximity factor cuts against finding attenuation, because only approximately ten minutes elapsed between the unconstitutional stop and the search of Walker. *See id.* at 2062. There is similarly no doubt that the intervening-circumstances factor favors attenuation, because Walker was arrested pursuant to a valid, unrelated warrant that predated the stop. *See id.* The parties do not seriously dispute either of these conclusions.

16

The parties fiercely dispute, however, whether the officers' conduct was purposeful or flagrant. We conclude that the conduct was purposeful or flagrant, and therefore, the attenuation doctrine does not apply. There are two primary reasons why the officers' conduct here is "most in need of deterrence." *Id.* at 2063. First, the explanation for stopping Walker is "woefully short" of what the Fourth Amendment requires. *See United States v. Shrum*, 908 F.3d 1219, 1239 (10th Cir. 2018). Second, any suspicion that Walker was the individual in the photograph was dispelled when Montanino approached Walker and could confirm that he was not the photographed suspect.

As discussed above, there are numerous reasons why the officers lacked any objectively reasonable suspicion to stop Walker. Most glaring is the fact that the email and photograph Montanino cited in justifying the stop contains no indication that the photographed individual had committed any crime, rendering Montanino's explanation for stopping Walker so obviously deficient that it constitutes "deliberate, reckless, or grossly negligent conduct." *Herring v. United States*, 555 U.S. 135, 144 (2009). Similarly, any reliance on the fact that Walker, like the photographed individual, was a black male with medium-to-dark skin tone, glasses, facial hair, and long hair is such an unsound basis that

17

we cannot characterize it as mere negligence, especially when considering the significant costs of such conduct: "specificity in articulating the basis for a stop is necessary in part because according the police unfettered discretion to stop and frisk could lead to harassment of minority groups and severely exacerbate police-community tensions," *Dancy*, 843 F.3d at 111 (internal quotation marks and citation omitted), in addition to subjecting individuals to the "humiliations of [] unconstitutional searches" based on race, *Strieff*, 136 S. Ct. at 2070 (Sotomayor, *J.*, dissenting). With "discretionary policing" comes "opportunities for racial profiling." Sarah A. Seo, Policing the Open Road 264 (2019).

The Government correctly points out that lack of reasonable suspicion alone is not enough to find conduct to be purposeful or flagrant in light of *Strieff*. But it is not simply the lack of reasonable suspicion that supports a finding of purposefulness or flagrancy here—rather, it is the *extreme* lack of reasonable suspicion. *See Herring*, 555 U.S. at 143-44 (observing that the exclusionary rule may apply when an officer's search was "patently unconstitutional," was "so lacking in sworn and particularized information that not even an order of court would have justified such procedure," or was conducted "without a shadow of authority" (internal quotation marks and citations omitted)). In other cases in

which the evidence and unconstitutional stops were sufficiently attenuated, the officers' mistakes were less egregious. In *Strieff*, for instance, the officer had seen defendant Strieff exit a house believed to be a drug house based on a tip and the officer's own surveillance. 136 S. Ct. at 2059-60. The officer's central mistake was in failing to ascertain the length of time Strieff had spent at the house, thereby calling into question whether Strieff had been at the house for an illegal drug transaction. *Id.* at 2063. But unlike in *Strieff*, in which the suspicion of criminal activity was based on two independent sources suggesting drug activity in the house Strieff had exited, absolutely nothing in the record supports Montanino's belief that the individual in the emailed photograph had committed a crime. And while the officer in *Strieff* had based his suspicions of Strieff's criminality on observing Strieff exit the suspected drug house, Montanino's suspicions were largely based on Walker's skin color.

Similarly, in *United States v. Mendez*, 885 F.3d 899, 905 (5th Cir. 2018), although the officers lacked reasonable suspicion in stopping and searching defendant Mendez's car, they only did so to detain Mendez while other officers executed a search warrant at Mendez's home. Mendez was known to be "armed, dangerous, and unstable," he was a suspect in a drive-by shooting, and "there

19

were bullet-riddled vehicles sitting in his front yard." *Id.* at 912. Accordingly, the Fifth Circuit concluded that the officers "were motivated by genuine, serious, and objectively reasonable safety concerns." *Id.* By contrast, Montanino had no indication that *any* crime had been committed, let alone a violent crime. Nor was there any other allegation that Walker was considered armed or dangerous.

Even if Montanino's justification for the stop were not woefully anemic, the officers' conduct is purposeful or flagrant for yet another reason. Any suspicion that Walker was the individual in the photograph was dispelled when Montanino approached Walker and could confirm that he was not the photographed suspect. Nonetheless, pursuant to the Troy Police Department's stop-out practice, the officers ran a search for outstanding warrants against Walker and Hopkins. But after the dissipation of any reasonable suspicion, there was simply no cause to run Walker and Hopkins's identifications for warrants—beyond, that is, a mere fishing expedition "in the hope that something would turn up." *Strieff*, 136 S. Ct. at 2064 (internal quotation marks and citation omitted). Given that the officers' conduct continued after the elimination of any reasonable suspicion that may have existed, suppression is warranted. *See, e.g., United States v. Lowry*, 935 F.3d 638, 644 (8th Cir. 2019) (emphasizing the absence

20

of evidence "that Officer Hand *knew* that he lacked reasonable suspicion and flagrantly disregarded that fact" in concluding that the conduct was not purposeful or flagrant).

Finally, we decline to address Walker's argument that Walker's stop was part of the Troy Police Department's "practice of pulling a police car over and indiscriminately stopping residents of Troy, New York to randomly confront them with questions, request their identification when no criminal activity is suspected and run their information for warrants." Appellant's Reply Br. at 14. Though such conduct would certainly meet *Strieff*'s articulation of purposeful or flagrant conduct, we need not reach this argument in light of our decision that the conduct is purposeful or flagrant for other reasons.

Because the officers lacked an objectively reasonable belief that Walker was engaged in, or had previously engaged in, criminal activity, the stop was unconstitutional. In addition, because the justification for stopping and identifying Walker falls woefully short of what the Fourth Amendment requires, the conduct was purposeful or flagrant. Reliance on the photograph to stop Walker involved impermissible and manifest stereotyping, which cannot be characterized as merely negligent conduct. Even if the officers had been justified

21

in making the initial stop, their continued questioning when it was evident that Walker was not the person in the photograph would justify rejecting the attenuation doctrine. Therefore, the attenuation doctrine does not apply, and the statements made and narcotics seized must be suppressed as the fruit of an unconstitutional search.[3]

## CONCLUSION

For the foregoing reasons, we reverse and remand the district court's denial of the motion to suppress.

---

[3] On appeal, Walker also challenges the district court's determination that Furciniti's question to Walker was not a custodial interrogation requiring *Miranda* warnings. In light of our holding, we need not reach the *Miranda* issue.